IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| SANTA MARIE VIA, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 3:17CV00047 |
| | ) **JURY TRIAL DEMANDED** |
| COMMUNICATIONS CORPORATION OF AMERICA, INC., and STEPHEN R. FISHER, | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff, Santa Marie Via ("Via") (pronounced, "Vhy"), by counsel, files her Complaint against Defendants, Communications Corporation of America, Inc. ("CCA"), and its President, Steven R. Fisher ("Fisher"), and alleges as follows:

## NATURE OF THE ACTION

1. By this action, Via seeks all relief to which Via is entitled pursuant to the claims and counts described herein, including preliminary and permanent injunction, compensatory damages, consequential damages, punitive damages, attorneys' fees and costs, and any other form of relief, however denominated, at law or equity, available to Via arising out of Defendants' willful and malicious disregard of Via's lawful rights and privileges as protected by the federal Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12111, *et seq*. ("ADA"). Defendants, and each of them, failed to reasonably accommodate Via during a time that CCA and Fisher knew that Via was disabled by the effects of diagnosed fibromyalgia, including major depression disorder. CCA and Fisher, including through CCA's Human

Resources Director, Kelli Drumgoole ("Drumgoole"), acted against Via with complete disregard of ADA mandates.

## PARTIES, JURISDICTION, AND VENUE

2. Via is a former managerial employee of CCA, who spent a career at CCA. She began work at CCA in August 1983, and worked at CCA in many different managerial positions until Defendants summarily terminated her employment on May 16, 2016.

3. CCA is a for-profit Virginia corporation in the business of producing and issuing mass mail campaigns from its sole plant in Boston, Virginia. At all times relevant to this Complaint, CCA has employed more than 150 persons.

4. Fisher is, and at all times relevant to this Complaint, was the President of CCA with ultimate authority over the hiring and firing of CCA managers, such as Via. At all relevant times, Fisher dominated the policy making and decision making processes at CCA, and was the sole decision maker with respect to all actions attributed to CCA herein.

5. This Court has original subject-matter jurisdiction over this matter under 28 U.S.C. § 1331, 42 U.S.C. § 12117(a), and 42 U.S.C. § 2000e-5(f)(3).

6. Personal jurisdiction is proper in this judicial district because Defendants reside, work, or otherwise maintain continuous and systematic contact within this judicial district.

7. Venue within this judicial district is proper under 28 U.S.C. § 1391(b), because each Defendant is subject to personal jurisdiction in this judicial district and because a substantial part of the conduct giving rise to this action occurred within this judicial district.

## CONDITIONS PRECEDENT

8. Any and all conditions precedent to bringing or maintaining this action have been satisfied by Via or have been excused or waived by Defendants.

# FACTS

9. Via is a life-long resident of Virginia, born on October 13, 1960. She began work at CCA in August 1983. During her career at CCA, she worked in nearly every department. On or about 2001, CCA promoted her to a managerial position with the title "Director of Production." She thereupon became responsible for scheduling production for all jobs awarded to CCA, and for ensuring that production timelines were met according to CCA's client requirements. Initially, she managed approximately 180 employees. CCA grew. As managers departed from CCA, and Via showed her ability, CCA assigned more departments to Via. In or about March 2014, CCA reassigned the finishing and mailroom production areas to Via. From that time until CCA and Fisher fired her, Via managed four major departments at CCA: programming; data processing; finishing; and mailroom. Over the years, CCA and Fisher treated Via with respect and flexibility in connection with major life events, including illness.

10. Via has a long history of negotiating with CCA and Fisher on her work conditions. On or about June 30, 2015, Via met with Fisher to seek a raise in her annual salary to reflect the additional duties she had performed well since March 2014 (and would continue to perform) and in light of the fact that Via had not received a raise since 2008. Fisher advised Via that she should visit with him to discuss a salary raise after the summer months on the premise that, because the summer months were slow for CCA, Fisher could not or would not negotiate a raise for Via. Via and Fisher agreed to meet at a later date to be determined. However, in September 2015, Via discovered that an employee who had worked under Via's supervision had received a salary increase from Fisher, who did not advise Via of the negotiations or the raise. To Via's surprise, her subordinate was now earning what Via was earning. Via then met with Drumgoole, who instructed Via "to sit tight and not say anything," to Fisher; Drumgoole advised Via that Drumgoole was working with Fisher on increases for Via and three others, including

Drumgoole herself, Mitzi Mills, and Troy Orndoff. Several days later, Via inquired of Drumgoole, who reported to Via that the increases were "still in the works." Via again inquired the following week. Drumgoole advised Via that "there were no raises" and that Via "would have to speak to Steven [Fisher] directly." Later that week, Via received a CCA payroll report, which showed that salaried payroll had increased. Via deduced that Mills, Drumgoole, and Orndoff had all received increases. Via then went to Fisher and asked for a raise. Fisher replied: "no." Via then asked how Fisher could authorize a raise for Mills, Drumgoole, and Troy but not for Via. Fisher was surprised that Via knew about their salary increases, and replied that Via made more in salary then each of Mills, Drumgoole, and Troy. Via then reminded Fisher that Via was responsible for more departments, more people, and more equipment than each of the others, that Via had not had a salary increase in 7 years and that, unlike Mills, Drumgoole, and Orndoff, who had all quit CCA at one or more points in time in the past, Via had never quit CCA only to return later. Fisher was not moved.

11. Approximately six months later, in early February 2016, Via became ill and advised Fisher and others at CCA. Via was ultimately diagnosed by a rheumatologist, Dr. Angela R. Crowley of the University of Virginia Health System ("UVA"), as suffering from fibromyalgia and its symptoms, all brought on by job stress. On February 11, 2016, Dr. Crowley issued the following notice:

> To Whom It May Concern:
>
> I have been treating Ms. Via for psoriatic arthritis and fibromyalgia. She is having significant issues with pain, fatigue and anxiety related to medical conditions and job stress. I have recommended she take some time off from work (1-3 months) as well as various medical interventions.

Via promptly produced Dr. Crowley's letter to Drumgoole.

12. On or about February 12, 2016, Drumgoole presented Via with several forms for Via to complete to establish Via's right to leave under the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA").

13. On or about February 12, 2016, Via provided Drumgoole with materials for Drumgoole to submit to ensure that Via secured short-term disability insurance under an Aflac policy that CCA had made available to its employees ("Aflac STD Policy").

14. Via completed the FMLA and Aflac STD Policy forms as required, and returned them to Drumgoole on or about February 16, 2016.

15. The forms as prepared by Drumgoole provide in pertinent part:

(a) that Ms. Via was required to take sick and vacation leave as part of her FMLA leave; and

(b) that CCA did not consider Ms. Via a "key employee" under the FMLA, *i.e.,* CCA did not reserve the right not to restore Ms. Via to employment following FMLA leave on the grounds that "such restoration will cause substantial and grievous economic injury to us."

16. Nothing in the FMLA forms was discussed, much less negotiated, between Via and CCA, including CCA's Fisher or Drumgoole. And nothing in the forms referenced Via's rights or duties under the ADA.

17. On February 25, 2016, Drumgoole issued a letter to. Via indicating that Via's request for FMLA leave had been granted. The letter stated in pertinent part:

> In accordance with FMLA guide lines you are entitled to up to 12 weeks of unpaid leave within a twelve-month period. Your request for a medical leave of absence for the period beginning February 8th, 2016 through May 8th, 2016 has been approved. Although your leave exceeds the 12 weeks allotted by FMLA, we are granting you an additional week of unpaid medical leave of absence based on the information your physician submitted. You are expected to return to duty on May 9th, 2016 at your regularly scheduled work time.

5

18.     On February 29, 2016, Via met with Dr. Lora D. Baum, Ph.D., a Clinical Health Psychologist, who diagnosed Ms. Via as suffering from major depressive disorder. Via gave Drumgoole the notice from Dr. Baum. From February through May 2016, Via continued treatment with Dr. Baum, with her UVA rheumatologists, and with her family doctor, Dr. Zareen Babar. During this time, Via responded in a timely way to CCA's request for updates on her condition or any other request that CCA made of her. During this time, Via lived off of the Aflac STD Policy proceeds that Drumgoole had helped Via to arrange.

19.     On April 14, 2016, Via came to CCA's offices to meet with Fisher. During the meeting, which lasted roughly one-half hour, Via explained to Fisher the symptoms of fibromyalgia and severe depression, and her expected recovery. During the meeting, Via stressed to Fisher that she wanted to return to work and that she did not want to lose her job. Her last question to Fisher: "If I cannot return to work after my FMLA is up, will I lose my job?" Fisher replied: "No." There was no discussion, much less any negotiation, at the meeting between Fisher and Via on how CCA might reasonably accommodate Via upon the exhaustion of her FMLA leave.

20.     On April 26, 2016, Via met with Dr. Baum, who informed Via that, in Dr. Baum's professional judgment, Via was not yet ready to return to work on May 9, 2016, but would be able to return in about 8 weeks. Dr. Baum issued a notice that day containing her prognosis for Via, stating in pertinent part:

> To whom it may concern:
>
> I began treating Sandy Via for Major Depressive Disorder and Fibromyalgia on February 29, 2016. She had recently taken a leave from her full-time employment due to an inability to function well. Although she is making slow progress, at this time, I do not believe she is capable of returning to work. I would hope she may be able to return in about 8 weeks.

On May 3, 2016, Dr. Babar issued a similar notice. Both medical notices recommended continued medical leave for Via for eight weeks beyond early May 2016 (or through July 5, 2016).

21. On April 29, 2016, Via received a letter from Fisher dated April 25, 2016, in which CCA unilaterally (without any input whatsoever from Via or her doctors) required Via to return to work May 9, 2016, with a different managerial role. Fisher's letter, apparently drafted by Drumgoole, states:

> The time is nearing for you to return from your FMLA leave. We ask that your primary doctor provide a release, prior to May 9th, 2016, stating that you are eligible to return full time. The release can be faxed to Kelli Drumgoole at 540-302-8036 or emailed to Kellii.drumgoole@cca.net.
>
> While your pay rate has remained the same and your position has been held in anticipation of your return, after speaking with you personally, I have made the following adjustment in effort to accommodate your current condition. Your sole responsibility will be the scheduling department. Your duties will include scheduling production, ensuring production reports are updated in a timely manner, managing two scheduling clerks and helping with the implementation of the new scheduling system. I feel this is the best course of action for you to have a successful return.

22. On May 6, 2016, Via met with Fisher and Drumgoole at CCA to advise them that Dr. Baum and Dr. Babar were indicating that Via could return to work in or about July 5, 2016 (eight weeks after May 9, 2016). Via brought a copy of her doctors' letters to the meeting.

23. During the meeting, Via assured Drumgoole and Fisher that Via believed that, upon her return to work in July 2016, Via could work with the new managerial assignments that Fisher had outlined in his letter of April 25, 2016.

24. Drumgoole asked Via if Via thought that Via would be able to return to full-time work and perform the job as outlined after an additional eight weeks of leave (as recommended by Via's doctors). Via responded that she hoped so.

25. Via then advised both Drumgoole and Fisher that, upon Via's return, Via's need for evening sleep and her evening medication would prevent Via from monitoring and answering her phone during evening hours. Drumgoole and Fisher indicated that they understood that limitation.

26. When the meeting was over, Via, Drumgoole, and Fisher walked from Fisher's office out into the reception area at CCA's headquarters. As Via was getting ready to walk out the front door, Fisher hugged Via and assured her that "it will all work out."

27. There was no discussion on May 6, 2016, by which CCA indicated that it would not continue to keep Via's job for her for eight weeks past her FMLA leave; no discussion on how CCA might be adversely affected by Via's absence from May 9 through July 5, 2016 (typically, a slow time for CCA); and no discussion on how, if at all, Via might return to work on some basis other than full-time prior to July 5, 2016.

28. Far to the contrary, Via left CCA that day with the understanding that CCA had agreed to allow her to return to her new CCA duties after an additional eight weeks of full-time leave, during which she would continue to receive benefits under the Aflac STD Policy.

29. On May 16, 2016, Ms. Via received a registered letter from Fisher dated May 12, 2016, summarily terminating Ms. Via's employment with CCA. The letter stated:

Re: Notice of Termination

Dear Sandy,

Thank you for scheduling the meeting with Kellii Drumgoole and me on May 6, 2016, to update us on your current condition. It was unfortunate to learn from you that you were not able to return to work on May 9, 2016, as scheduled. However, I was happy to hear that you are making some progress with your treatments.

As you know, your return date of May 9, 20 16, was scheduled to coincide with expiration of your FMLA leave. This return date was based on your doctor's

> paperwork dated February 18, 2016. At our May 6, 2016, meeting, you provided two letters from your doctors (your primary care doctor and your psychologist), each stating you would not be able to return to work on May 9, 2016, as scheduled. Further, your doctors' letters stated that you would not be released from medical treatment or able to return to work for at least another eight weeks.
>
> Unfortunately, since your FMLA leave is exhausted and you are not currently able to return to work, we can no longer hold your position. Accordingly, your employment with CCA is terminated effective May 16, 2016. Your health insurance coverage will be active until May 31, 2016, and you will receive a separate letter with information regarding COBRA. We will also send you an application to continue your group life insurance pol icy directly through Aflac, if you wish.
>
> If you would like for Gail Morris [Ms. Via's wife, also employed at CCA] to pick up any of your remaining personal belongings, please provide us a signed, written authorization to this effect. Also, please return the cell phone issued to you as soon as possible, but not later than May 31, 2016.
>
> With much gratitude, I thank you for your years of service with CCA. Again, I wish you the best and hope for your continued improvement.

Via was not afforded an exit interview to discuss why she was terminated or what she could do to save her job and its many benefits. Several days later, Fisher was asked if he would provide. Via with a severance package; Fisher quickly replied "no" without explanation.

30. The year since has been harrowing for Via, as she has struggled with the extra stress of having been terminated without explanation and having to work out medical coverage under COBRA.

31. Because CCA and Fisher summarily discontinued Via's health insurance coverage, Via was unable to secure medication refills from June 7 through June 15, 2016.

32. Via has been searching in vain for employment elsewhere in Virginia.

33. At all times relevant to this Complaint, Defendants have conducted themselves with malice or with recklessness akin to malice in connection with Via's exercise of his lawful rights and privileges.

34. On or about October 25, 2016, Via filed a charge of disability discrimination with the United States Equal Employment Opportunity Commission in Richmond, Virginia ("EEOC"). Via's charge alleged disability discrimination in the failure of Defendants, or either of them, to engage in an interactive process on a good faith basis to determine reasonable accommodations to enable Via to resume her work and in Defendants' ultimate failure to provide reasonable accommodation to Via.

35. On April 18, 2017, the EEOC issued notice to Via of her right to sue with respect to her charge.

## COUNT I
## VIOLATION OF ADA

36. Via incorporates by reference and restates here the allegations in Paragraphs 1 through 35 above.

37. The ADA requires that a qualified individual with a disability be reasonably accommodated to enable her to perform the essential functions of her job in the absence of proof of some undue hardship.

38. Via is a qualified individual with a disability since she suffered from a mental or physical disorder that "substantially limits" the "major life activities" of "functions of the immune system, . . . neurological, brain." 42 U.S.C.§ 12102 (1)-(2).

39. Via is and, in May 2016 was, able to perform the essential functions of her job as a manager in the Scheduling Department for Defendants as long as she was reasonably accommodated with the provision of rest periods, flexible scheduling, and/or an additional 8 weeks from May 2016 to early July 2016, a period that Defendants knew had little or no production to schedule.

40. Defendants wrongfully and intentionally discriminated against Via because of Via's disability in violation of the ADA as follows:

    (a) By failing to engage in a good-faith, reasonable, interactive process to determine reasonable accommodations to enable Via to return to work;

    (b) By failing to consider reassignment of Via to a comparable position; and

    (c) By denying Via any reasonable accommodations which would have enabled her to return to work in her new position as Scheduling Manager

41. As a proximate result of Defendant's illegal acts of disability discrimination against Via, Via has suffered substantial damages, including lost income and benefits and other economic losses; mental anguish and emotional distress; loss of professional reputation and quality of life; and other damages to be proven at trial.

42. Via is entitled to appropriate relief pursuant to the ADA, including compensatory damages and reasonable attorneys' fees and costs for her representation herein pursuant to 42 U.S.C. § 12117(a).

43. Defendants engaged in disability discrimination against Via with reckless indifference to her federally protected rights. Accordingly, Via is entitled to punitive damages pursuant to 42 U.S.C. § 1981a(b).

44. At all times relevant to this Complaint, Defendants conducted themselves (i) with evil motive, actual malice, deliberate oppression toward Via, (ii) with intent to injure Via or her interests, and/or (iii) in willful disregard for Via's lawful rights and privileges.

**WHEREFORE**, Via respectfully requests that this Court enter judgment in favor of Via and against Defendants:

    (a) ordering Defendants to reinstate Via with reasonable accommodations;

(b) ordering Defendants to pay Via back pay and restoration of all benefits;

(c) ordering Defendants to pay Via compensatory damages in an amount in excess of $95,000 per year;

(d) ordering Defendants to pay Via punitive damages to the maximum amount allowed by the Fifth Amendment to the United States Constitution;

(e) ordering Defendants to pay to Via the costs of this action and reasonable attorneys' fees as required by 42 U.S.C. § 12117(a);

(f) ordering Defendants to pay Via pre- and post-judgment interest on all damages awarded; and

(c) ordering that Via be awarded such other and further relief from Defendants, at law or in equity, to which Via may be entitled.

## JURY TRIAL DEMAND

Via demands a trial by jury as to all issues so triable.

Dated: July 17, 2015
.

Respectfully submitted,

**WILSON LAW PLC**

/s/ *Robert O. Wilson*
Robert O. Wilson (VSB 77791)
2 South Main Street, Suite 409
Harrisonburg, VA 22802
Phone: (540) 430-0122
Email: robert@thewilsonlaw.com

*Counsel for Plaintiff*

**OF COUNSEL:**

Mitchell J. Rotbert (*pro hac vice motion forthcoming*)
**ROTBERT BUSINESS LAW P.C.**
8937 Shady Grove Court
Gaithersburg, Maryland 20877
Phone: (240) 600-6467
Fax: (888) 913-207
Email: mitch@rotbertlaw.com